UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

              Plaintiff,

              vs.

NICHOLAS MITSAKOS,

              Defendant.

Index No.: 16-CR-631 (DC)

**NICHOLAS MITSAKOS'S MEMORANDUM OF LAW
IN AID OF SENTENCING**

August 31, 2017

CREIZMAN PLLC
Attorneys at Law
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022

*Attorneys for Nicholas Mitsakos*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... I

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS CONCERNING THE OFFENSE CONDUCT ................................. 4

    I.    RELEVANT BACKGROUND ............................................................................ 4

        A.    Educational Background and Early Professional Experience ................................. 4

        B.    Biotechnology Career ......................................................................... 5

        C.    Mitsakos's Academic, Community Service, and Charitable Pursuits ................... 6

    II.    THE ORIGINS OF MATRIX CAPITAL MANAGEMENT .......................................... 9

        A.    Mitsakos's friendship with Steven Connell and exposure to Interlaced Capital .... 9

        B.    The formation of Matrix Capital Management ..................................................... 10

        C.    The evolution of Matrix Capital ....................................................... 10

        D.    The formation and demise of the Meridian-Matrix Joint Fund ........................... 12

SENTENCING GUIDELINES CALCULATION ........................................................ 17

OBJECTIONS TO THE PRESENTENCE REPORT'S ANALYSIS ........................................ 18

PERSONAL CHARACTERISTICS ........................................................................ 21

    I.    NICHOLAS MITSAKOS'S CHILDHOOD .................................................... 21

    II.    NICK'S PASSION AND ACUMEN FOR BUSINESS AND ENTREPRENEURSHIP ..................... 22

    III.    NICK'S REPUTATION FOR TRUSTWORTHINESS AND THE HIGHEST LEVEL OF INTEGRITY 25

    IV.    NICK'S LOYALTY AND FRIENDSHIP ................................................................ 27

A NON-GUIDELINE, NON-CUSTODIAL SENTENCE  IS WARRANTED UNDER 18 U.S.C. §3553(A) .................................................................................................... 29

    I.    A NON-CUSTODIAL SENTENCE IS WARRANTED BECAUSE OF MITSAKOS'S PERSONAL AND FAMILY CIRCUMSTANCES. ........................................................................ 29

        A.    The impact of a prison sentence on Mitsakos's family will be devastating. ........ 29

B.      Mitsakos's conduct represents aberrant behavior in an otherwise exemplary life.
31

II.     A NON-CUSTODIAL SENTENCE IS WARRANTED TO AVOID UNWARRANTED SENTENCING
DISPARITIES. .................................................................................................................... 32

III.    A NON-CUSTODIAL SENTENCE IS SUFFICIENT TO SATISFY THE GOAL OF SPECIFIC
DETERRENCE. ................................................................................................................... 34

IV.     A NON-CUSTODIAL SENTENCE IS SUFFICIENT TO ACHIEVE GENERAL DETERRENCE ....... 35

CONCLUSION ................................................................................................................... 39

On May 25, 2017, Nicholas Mitsakos pleaded guilty to Count One of the Indictment charging him with conspiracy to commit securities fraud, in violation of 15 U.S.C. §78j(b) and 78ff, and wire fraud, in violation of 18 U.S.C. §1343.  We submit this memorandum of law in advance of Nicholas Mitsakos's sentencing hearing scheduled for September 14, 2017, to describe Mr. Mitsakos's personal background, his good character, the wrongdoing for which he was convicted and for which the Court must sentence him, and the substantial mitigating factors that exist here, with respect to Mr. Mitsakos and his culpability in the offense conduct, both individually and relative to those who were deemed his co-conspirators, in order to assist the Court in fashioning an appropriate sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing under 18 U.S.C. § 3553(a).

## PRELIMINARY STATEMENT

Nicholas Mitsakos is a 58-year-old man who, until his arrest nine months ago, enjoyed a universally sterling reputation, not only as a farsighted entrepreneur with a distinguished career, but as a genuinely good, caring person whose priorities extended far beyond himself.  Once highly sought after to serve on the boards of biotech companies, for which his expertise and experience in that industry was a valuable commodity, he has had to resign and distance himself from many of those organizations.  Once vigorously pursued to help numerous charitable and non-profit organizations manage their business affairs, and relied upon for his deep personal involvement and innovative ideas to help those institutions accomplish their goals, his criminal case has required those same organizations to diminish his profile and responsibilities.  Once a source of great comfort to his 90-year-old mother, not only for providing companionship and economic support to her for many years, but also to his 61-year-old sister, who has suffered since childhood from cerebral palsy and Dandy-Walker syndrome, his criminal case and pending

sentencing has caused her severe distress and anxiety, and has depleted much of her economic resources.  In the course of only eight months, Mr. Mitsakos's life and the lives of those closest to him have been irreparably shattered.

But the letters submitted to this Court on Mr. Mitsakos's behalf express great hope for his future, because they speak so personally, with great specificity, of a man who has touched the lives of others, as a friend, as a member of his community, as a caretaker, as a selfless and determined advocate of people with special needs and those less fortunate, and even as a role model for business ethics.  The notion that Mr. Mitsakos was charged with, let alone pleaded guilty to fraud is unfathomable to those who are closest to him, and is so far out of character of the man they know so well.  They are not at all surprised that he has accepted responsibility and is remorseful for his wrongdoing.  They are also absolutely confident that Mr. Mitsakos's conduct here was "one-off" and "aberrant," that he will never reoffend, and that his family, his community, and society as a whole will be far better off with him out of prison than inside of it, even if he is incarcerated for a short period of time.

And for good reason.  Because despite all that has happened over the past eight months, and notwithstanding the dramatic blow to his reputation, Mr. Mitsakos was asked by the professor and director of Uro-Oncology Research at Cedars-Sinai to serve as chief executive of a start-up biotechnology company devoted to new and potentially groundbreaking cancer treatments.  This offer was made after Mr. Mitsakos met personally with the professor, who understands and is well aware of Mr. Mitsakos's legal circumstances. Because this does not involve the securities industry or a hedge fund, a world in which Mr. Mitsakos was a neophyte, but biotechnology, the field in which Mr. Mitsakos built his successful career and unblemished reputation.  In this new position, Mr. Mitsakos will develop the company's business and

operating plan, and manage the administrative and executive functions of the overall business, which includes focusing a team of over 20 medical researchers.

In addition, as is reflected in the letters to the Court, Mr. Mitsakos will continue to play an active role in the UCLA Center for Cerebral Palsy, as well as contribute a substantial portion of his time, labor, and skills to The People Concern, a non-profit organization that is dedicated to combatting homelessness of the mentally ill in Los Angeles with through a combination of services and housing. Moreover, Mr. Mitsakos will continue to be the primary caretaker of his mother and the primary family member responsible for overseeing the care of his disabled sister.

Former Eastern District Judge John Gleeson observed that "[a]s a nation, we need to deal with—and not just talk about—our over-incarceration problem. . . . We sentence too many people to prison in the first place." *United States v. Dokmeci*, 2016 WL 915185 at *1-2 (E.D.N.Y. Mar. 9, 2016). The courts should seek to deal with defendants, where appropriate, "in better, more humane, and more cost-effective ways." Here the most humane, cost-effective method of addressing Mr. Mitsakos's conviction is a sentence of probation in light of:

(i)     his personal history of steady employment, good works, and service to the community;

(ii)    his family circumstances, including the devastating impact that an incarceratory sentence would have on his elderly mother and his severely disabled sister;

(iii)   the aberrant nature of his offense conduct, as more fully discussed below;

(iv)    his lack of personal, economic gain and his genuine commitment to repay the sole victim of the offense, which, well before his arrest, he had made tremendous strides towards accomplishing;

(v)     the fact that this type of case, as far as we can tell, is unprecedented in that criminal charges were brought against the offender; many similar cases—indeed, the only cases we could find—were brought as regulatory actions by the SEC, and involved individuals who had far more experience in the securities industry than did Mr.

3

Mitsakos, and whose lies and intent to harm, unlike Mr. Mitsakos, were so clearly premeditated and borne of greed; and

(vi)     the fact that a sentence of probation—which can include a period of home detention and meaningful community service, including his commitment to The People Concern—will sufficiently promote respect for the law, provide substantial deterrence to others, and presents no chance of his reoffending, not only because he voluntarily settled with the SEC and agreed to a permanent bar from the securities industry, but because his past history reflects his true character and will be a force for the greater good if spared a prison sentence.

For all these reasons, and the reasons set forth below, we respectfully request that the Court impose a non-custodial sentence of probation, with conditions that the Court deems appropriate.

## STATEMENT OF FACTS CONCERNING THE OFFENSE CONDUCT

### I.  Relevant Background

A discussion of Mr. Mitsakos's professional background is necessary to place the offense conduct into appropriate context.

####   A.  Educational Background and Early Professional Experience

Mitsakos attended college at the University of Southern California, in Los Angeles, concentrating his studies in computer science and microbiology.  After graduating USC with a Bachelor of Science degree in 1981, Mitsakos worked at a startup technology company with a few of his close personal friends, which focused on computer graphics and game design. Mitsakos managed the financial and administrative affairs of the company.  In 1983, he was recruited by the Boston Consulting Group as part of a team that helped build its Los Angeles office.  There, he began to develop his interest and expertise in the biotechnology field.  He left the Boston Consulting Group to attend Harvard Business School, where he obtained an MBA. During his first summer at Harvard, he obtained a summer associate position with Goldman

4

Sachs.  After graduating from Harvard, he worked for two years at Drexel Burnham Lambert from 1986 to 1988.

### B.  Biotechnology Career

By developing a network of contacts, Mitsakos was determined to take a career path that allowed him to focus his career on the biotechnology industry and effectively become his own boss.  From 1989 forward, Mitsakos became an independent financial advisor and consultant, partnering with various investment firms to purchase and often take a management role in biotechnology companies.  In that capacity, Mitsakos would analyze the marketplace and prioritize which research programs would be most profitable for the biotech company.  Mitsakos developed substantial expertise in researching these areas and identifying which pharmaceuticals or therapies to develop and when.  He earned a reputation for his keen understanding of the market and his ability to identify profitable deals for biotech companies and promising biotech businesses.  As a result, he was highly sought after by many biotech companies for board membership, and by investment companies for his acumen in developing strategy and management in the biotech sector.  He developed especially profitable joint venture relationships with Rosecliff Investments, Franklin Templeton International, SunAmerica Asset Management, and Trust Company of the West.  At the time of his arrest, Mitsakos served as Executive Chairman of the board of directors of Cardax Pharmaceuticals, based in Hawaii, of which he owns shares—Cardax became a publicly-traded company in February 2017, seven months after Mitsakos was arrested and had to take a leave of absence.

Mitsakos's career path allowed him to have more control over his time and the projects on which he worked.  He enjoyed moving from challenge to challenge, and helping to build and develop various companies.  A close friend, George Davis, observed that "Nick's passion for

5

biotech and helping the word through medical innovation is genuine and indicative of what drives him personally.  He is very animated when discussing the work and the fundamental science in and around the start-ups he has played a major role in creating.  I have seen him engage with doctors in a social environment and have been amazed by the depth of his network of researchers and doctors and knowledge of the state of play in latest therapies and theories." (Ex. D).

### C.  Mitsakos's Academic, Community Service, and Charitable Pursuits

By having relative freedom from a more structured work schedule, Mitsakos was also able to pursue other interests that he truly enjoyed.  From 1993 to 1998, Mitsakos served as a guest lecturer and taught classes at the UCLA Anderson School of Business for only an honorarium.  Mitsakos's passion and skill for teaching was evident to anyone who attended his lectures.  According to Bill Oppenheim, a friend and director of the UCLA Center for Cerebral Palsy, "[w]hen I saw a flyer on campus which announced that he would be a guest speaker for the Anderson School of business, I and several members of our group joined a standing room only crowd of business students as Mr. Mitsakos described the trials and tribulations of investing in a cement factory in Shanghai, China.  All of us learned from him that day, and his answers during the subsequent question and answer period showcased his expertise, cross cultural sensitivity, and humility, along with an ability to inspire younger individuals.  He drew a standing round of applause."  (Ex. H).  His business school classmate, Barbara Moore, observed that "[o]ur society could desperately use his exceptional ability to explain complicated concepts clearly and in a humorous, engaging fashion, especially where the teaching resources are thinly spread."  (Ex. Q).

One of Mitsakos's other projects over the years was advising on the formation of the Harvard Innovation Labs and developing curricula for that program, which helps Harvard students "explore entrepreneurship, meet and engage with a growing community of first-time founders and experienced entrepreneurs, ideate in human-centric ways, prototype and built to test the practicality of their visions, and launch and grow their ventures."[1]  Unfortunately, Mitsakos's arrest brought an abrupt end to his involvement in that program.

Mitsakos also devoted considerable time and energy to several causes close to his heart. For example, for over twenty years, he has worked with the UCLA Center for Cerebral Palsy, during which time, according to Theresa Wong, "he helped a group of dedicated orthopedic and neurological surgeons, along with physical therapists (I was one of those therapists), develop one of the most outstanding centers for the treatment of cerebral palsy patients anywhere in the world.  He brought his business discipline, compassion, organizational skills, friendship and generosity to enable the Center to attract new talent, raise essential funds, develop ideas for new systems and processes, work with a disparate group of professionals and experts, and helped the Center become much more effective."  (Ex. F).

Mitsakos, whose father was a fighter pilot for the Allies in World War II, also volunteered for the Wounded Warriors outpatient clinic program of the Neurological Rehabilitation Hospital of the Pacific.  Mitsakos oversaw a program of "taking groups of warriors to the beach—simply playing in the water, trying to paddleboard, talking with fellow

---

[1] *See* https://i-lab.harvard.edu/explore/about/

veterans and others, [and] helped create a sense of joy and belonging once again."  (Ex. F).

Mitsakos was also instrumental in helping Theresa Wong create an outpatient clinic at the

Neurological Rehabilitation Hospital of the Pacific for treatment of patients with severe

neurological injuries.  "Nick's knowledge of technology, contacts and oversight enabled the

clinic to develop groundbreaking capabilities for patients that would otherwise have no

alternatives for any physical treatment or physiological improvement. His efforts substantially

increased the quality of life for these patients and their families.  This would not have been

possible without his tireless efforts."  (Ex. F).

Mitsakos, a star athlete in high school, also has volunteered to coach local little league

teams.  According to his longtime friend Daniel Medina, who coached a team with Mitsakos,

"the kids loved Nick.  He was very knowledgeable about the game, and was able to impart that

knowledge to the boys on the team.  He was as patient and helpful with the least talented

member of the team as he was with the stars.  More importantly, the boys on the team saw Nick

as someone who cared about them as people and achieving their individual potential, not

necessarily on how successful we were as a team.  Nick was very busy professionally during

these two seasons, but he never missed a practice or a game, always prioritizing his commitment

and responsibility to the team.  I often tell Nick that he missed his true calling and should focus

on being a coach."  (Ex. M).

Mitsakos also has devoted time to playing music.  According to Mitsakos's friend,

Michael Stockman, "Nick is a highly talented and sensitive musician with a huge love for a

sweeping variety of different styles of music ranging from classical to jazz to rock, R&B, etc.,

similar to my own insatiable love of music.  Nick and I played music together for many years as

our careers and obligations would allow, collaborating and song writing, and we recorded three albums together which were wonderful creative experiences." (Ex. C).

And, of course, Mitsakos took advantage of his flexible schedule to care for his mother and his sister. As his mother recounts, "Nick has been with me in my home most of the last several years. He can still work effectively because I know that he can do his work as a board member or advisor from any location. Luckily, [he] can still do that from my home. He has specifically structured his professional life so that there is no one office that he is required to go to daily. This enables him to attend to me and my daughter's needs immediately and effectively." (Ex. A).

## II. The Origins of Matrix Capital Management

### A. Mitsakos's friendship with Steven Connell and exposure to Interlaced Capital

In about 2011, because of his involvement with Cardax Pharmaceuticals, Mitsakos traveled often to Honolulu, Hawaii, where Cardax was based, and lived there for several months out of the year. A friend of Mitsakos introduced him to Steven Connell, who had retired from the investment company, the Capital Group, as a partner and top-ranked analyst. Mitsakos and Connell hit it off immediately and became close friends. At the time, Connell was the chief investment officer and founder of a small boutique investment advisory firm in Honolulu called Interlaced Capital, which operated a hedge fund consisting principally of high net worth individual investors. Mitsakos would visit Connell at Interlaced and would discuss the market with Connell. Connell found Mitsakos's insights into the biotech sector to be valuable. Mitsakos became interested in money management and investing in securities. Mitsakos spent time with Connell and his associates, Jonathan Honda and Courtlin Holt-Nguyen, and discussed investment strategies.

9

### B.  The formation of Matrix Capital Management

Mitsakos, with his entrepreneurial spirit, encouraged Connell to form a hedge fund with him that would seek to manage funds for institutional investors.  Connell agreed, but because of his duties to Interlaced, Mitsakos agreed to do the lion's share of the work of developing the prospective fund's strategy and marketing the fund to investors.  In early 2012, Mitsakos and the Interlaced team chose individual accounts from those managed at Interlaced to represent an example of what their institutional hedge fund portfolio would look like.  Mitsakos and the Interlaced team began modeling a portfolio that was based on the Interlaced accounts, but assuming the investments were on a higher scale.  The model portfolio started with an assumption that it would receive $75 million from institutional investors, and invested those funds using the same parameters that were used for the representative individual accounts at Interlaced.  Mitsakos and the Interlaced team decided to call the prospective institutional fund Matrix Capital.  By 2014, the Matrix Capital model portfolio was established on Interlaced's Bloomberg systems.

### C.  The evolution of Matrix Capital

Based on comments from outside advisors and prospective investors, Mitsakos and the team at Interlaced would revise the model portfolio and refine its investment strategy.  One of the fundamental driving factors for revising the model portfolio was the feedback that the Matrix team received from institutional investors that institutional investors were interested in investing in hedge funds that took both long and short positions in securities.  By contrast, Interlaced only invested in long positions.  As a result, the track record of the model portfolio reflected historical performance based on the representative Interlaced accounts, but the portfolio decisions were constantly being refined to account for how the fund would trade with much greater assets under

10

management and with the ability to engage in both long and short trades.  The purpose of refining the portfolio was not to alter historical results to make the investment decisions look better to prospective investors, but to attempt to accurately reflect how Matrix would invest institutional funds.  In other words, Mitsakos did not retroactively modify the model portfolio to artificially enhance its returns.

In approximately mid-2014, Mitsakos began marketing the Matrix fund to institutional investors such as Blackstone, Investcorp, and Goldman Sachs Asset Management that specialize in investing in start-up hedge funds.  Mitsakos also began creating marketing materials, most importantly, monthly newsletters that reported on the fund's performance and investment strategies.  The bulk of the newsletters provided to institutional investors reflected that Assets Under Management were "Capital Raising," *i.e.*, there were no assets under management.  (Ex. X).  In addition, each of the newsletters contained a disclaimer that:

> No offer to sell or solicitation of an offer to buy any securities or commodities is made hereby.  Any investment in the fund should be based on a careful review of the applicable offering memorandum containing detailed description of the fund's investment program, fees, expenses, which is available to qualified parties upon request to Matrix Capital.

*Id.*

As Mitsakos acknowledged during his plea allocution, the newsletters were misleading in that they did not explicitly disclose that the portfolio was a hypothetical one.  Nor did the newsletters or marketing materials reveal that changes and revisions had been made to the model portfolio.  While Mitsakos sought counsel from an experienced securities lawyer at Wintston & Strawn to guide him in the process, it is clear that Mitsakos also took liberties in the manner in which he portrayed the fund's portfolio and its performance.  And although he did orally disclose to several investors that the fund was modeled and that there had been revisions, he certainly was

not careful in doing so in the written materials.  Mitsakos wanted the fund to succeed.  He had no intent to trade the funds in any way other than the strategies that he represented to prospective investors he would pursue.

Nevertheless, Mitsakos sought to grab the attention of prospective investors in an attempt to ultimately persuade them that he knew how to manage their funds in a profitable way.  He always believed that any investment would be made *only after* due diligence was performed, and expected that the investors would be explicitly informed of the lack of assets under management, that the portfolio was hypothetical, and that revisions had been made to it over time.  Unfortunately, after almost a year, none of the prospective investors expressed sufficient interest to move forward to the step of conducting serious due diligence and actually purchasing shares in the fund.

A former colleague of Mitsakos at Boston Consulting Group and a longtime friend, Charles Garvin, perhaps best sums up Mitsakos's errors in judgment in his letter to the Court:

> I have no direct knowledge of the circumstances that brought Nick before your bench. I can only say that as I read of them, they seem completely out of character with the Nick I know.  It is true, though, that Nick absolutely does have the glass-half-full and promotional mindset that entrepreneurs need, to believe in themselves and commit to venture enterprises where "reasonable" people would shy away.  That mindset is key to what we do in Silicon Valley, but it sounds as though in this case it may have gone too far.

(Ex. E).

### D.  The formation and demise of the Meridian-Matrix Joint Fund

By approximately February of 2015, Mitsakos had spent a great deal of time, energy, and his own savings in trying to get Matrix up and running, and he was failing.  The vast majority of Mitsakos's assets were illiquid, and Mitsakos had spent years trying to build Matrix without any success.  He fell into the sunk cost fallacy: he would continue to try to make the Matrix fund

work, when he should have simply left it behind.  Thus, when he was introduced to John Geraci

of Meridian Asset Management, he was overjoyed when Geraci expressed serious interest in

partnering with Mitsakos.  Meridian would raise capital from institutional investors for the Joint

Fund and Matrix, through Mitsakos, would make the investment decisions for the Joint Fund.

By the end of March 2015, Meridian and Matrix executed an agreement under which Meridian

would provide up to $500 million in capital to the Joint Fund, which would be managed by

Matrix.

Meridian made numerous promises to Mitsakos, none of which came to fruition,

including:

- the first $120 million raised by Meridian would be funded by the first of April 2015.

- Meridian would raise $100 million and deposit those funds into the Meridian-Matrix Fund by the end of April 2015.

- Meridian would definitely fund the Meridian-Matrix Fund with over $100 million by mid-May 2015.

- Meridian would surely obtain and deposit $100 million by the end of June 2015.

- Meridian was on the cusp of raising $200-$300 million and would deposit that into the Meridian-Matrix Fund by the end of July 2015.

- Geraci "would bet his life" that the Meridian-Matrix Fund would have at least $100 million raised by Meridian by August 12, 2015.

After these promises did not materialize, Mitsakos suggested that he and Geraci rescind

the Meridian-Matrix agreement, but Geraci promised that he had significant sources of capital

from insurance companies in Italy, Luxembourg, and Switzerland that would result in $400

million in investments by December 2015.  Geraci urged Mitsakos to be patient.  Ordinarily a

prudent investor, Mitsakos would have walked away, but at this point, he was so determined to

see Matrix succeed, and had invested so much of his money and energy in the promotion of the fund that his judgment was blinded.

In September 2015, Geraci told Mitsakos that he recognized that Mitsakos had incurred close to $400,000 of out-of-pocket expenses in preparing to run the Meridian-Matrix fund and promised to provide capital to Matrix to cover those expenses.  Meridian then funded Matrix's management account at Goldman Sachs with $2 million on September 21, 2015.  Because the money was deposited into Matrix's management account and not the Joint Fund account, Mitsakos believed that the funds were pre-paid management fees, designed to reimburse Matrix for out-of-pocket expenses relating to the Joint Fund, and to cover future disbursements.

Mitsakos told Geraci that he would put the rest of the funds, approximately $1.2 million, to good use in a leveraged trading account at Prophecy Asset Management, LP, for the benefit of Meridian.  Mitsakos did not believe that he was required to do this.  Under their joint fund agreement, Meridian and Matrix were 50-50 partners. Meridian had not yet provided any funds for operations, and Meridian's ownership arose from its commitment to raise capital from others for investment in the Joint Fund.  Nor was Meridian expected to invest in the Meridian-Matrix Fund and if it were, Mitsakos believed that Meridian would have done so through a subscription agreement, which it did not do.  Therefore, Mitsakos believed that the capital investment by Meridian was for the purpose of working capital and operations.  Nevertheless, Mitsakos, invested the $1.2 million into Prophecy because he believed that he did not require any additional funds for expenses and disbursements, and wanted to put Meridian's funds to work and demonstrate his skill at investing.

Within two months after investing, Meridian expressed to Mitsakos that it had provided the $2 million exclusively for the purpose of Mitsakos using the funds for investment purposes,

and not for the Mitsakos's use to reimburse his out-of-pocket expenses or compensation. Mitsakos disagreed because the funds were not placed in an account designated for the Joint Investment Fund, but for the Matrix Fund.  Indeed, Meridian had committed at least $500 million, plus, the terms of the fund required a minimum investment of at least $5 million per investor, and at least $50 million from the first investor to be made pursuant to a subscription agreement.  Therefore, Mitsakos believed based on his prior conversations with Geraci, and the fact that Meridian deposited the $2 million placed into Matrix's working capital account that the funds were to be used as seed capital at Mitsakos's discretion.

The evidence demonstrates that Mitsakos did not believe that he was misappropriating Meridian's funds.  To the contrary, Mitsakos was completely transparent regarding use of funds provided by Meridian.  Beginning in October 2015, Mitsakos enabled real-time viewing of the account details immediately for Meridian. In addition, he provided monthly line by line statements showing all expenditures from the account.  This information was provided by Goldman Sachs, who independently verified the accuracy of all the expenditures.  In addition, Mitsakos reviewed each expenditure monthly with the Joint Fund's Administrator, Harmonic. This independent party hired by Meridian confirmed the purpose and amount of every expenditure.

In addition, Meridian received copies of monthly statements showing the details of each investment in the Prophecy Account, including total amount of capital invested, and the gains and losses from each investment. These monthly statements were distributed to Matrix and Meridian at the same time at the end of each month from October 2015 to April 2016—the time Mitsakos managed this account.  Although Meridian began to protest about Mitsakos's use of the funds in December 2015, it allowed him to manage the account for six more months, reflecting

15

that Mitsakos was trading the account the way he said he would. There was complete transparency and no intent to deceive Meridian in that regard.

Nevertheless, Mitsakos attempted to work out his dispute with Meridian in good faith. Indeed, Mitsakos repaid Meridian $411,769.70 of the $800,000 that he used to reimburse business expenses and for prepaid management fees by January 12, 2016:

- Paid Meridian $100,000 on November 2, 2015

- Paid Meridian $100,000 on December 1, 2015

- Paid Meridian $200,000 on January 7, 2016

- Paid Meridian $11,769.70

For its part, Meridian demonstrated that it also intended to work out its dispute with Mitsakos in good faith by permitting Mitsakos to trade for Meridian at Prophecy from October 2015 until May 1, 2016, when Meridian took control over the Prophecy account.  (In April 2016, Mitsakos's trading resulted in losses of $224,036.).  During the six-month period Mitsakos managed the Prophecy Account, Meridian withdrew $325,000 in distributions.

During the period Mitsakos was managing the Prophecy account, Geraci continued to promise that it would raise and deposit millions of dollars into the Joint Fund.  In fact, in October and November of 2014, Geraci claimed that it was expecting to "imminently" deposit $60 million into the Joint Fund raised from outside investors.  Relying on those promises, Mitsakos falsely represented in Matrix newsletters to other prospective investors in November and December that Matrix had $60 million of assets under management.  Of course, that was a misrepresentation because Matrix had not received those funds, and, in any case, the funds would be assets under management for the Joint Fund, not Matrix.

16

At the end of the day, although Mitsakos believed that he had a genuine dispute with Meridian concerning whether he had the right to use the $2 million as he saw fit for seed capital, reimbursement of business expenses, and compensation, Mitsakos took responsibility for what he viewed as a misunderstanding and did his best to pay back Meridian.  He is committed to compensating Meridian for its losses in full, just as he tried to do, and made substantial progress towards doing, while he managed the funds.

Mitsakos has settled a parallel civil action by the Securities and Exchange Commission, and as part of his settlement, has agreed to a permanent bar from the securities industry.

## SENTENCING GUIDELINES CALCULATION

A district court should begin all sentencing proceedings by correctly calculating the applicable Sentencing Guidelines.  *See United States v. Crosby*, 397 F. 3d 103, 112-13 (2d Cir. 2005).  Under Mitsakos's plea agreement, the parties stipulated to the following Guidelines calculation:

- A base offense level of 6.  *See* U.S.S.G §2B1.1(a)(2).

- An enhancement of 14 levels because the loss to Meridian was approximately $860,000.  *See* U.S.S.G. §2B1.1(b)(1)(H).

- Because Mitsakos was the organizer, leader, manager, and supervisor of Matrix, interfaced with investors, and made the decisions on the content of its promotional literature, an enhancement of 2 levels is warranted.  *See* U.S.S.G. §3B1.1(c).

- Because Mitsakos pleaded guilty and allocuted to the satisfaction of the government in a timely manner, thereby demonstrating accepting responsibility for his conduct and permitting the government to avoid preparing for trial and to allocate its resources efficiently, a decrease of 3 levels is warranted.  *See* U.S.S.G. §3E1.1(a) and (b).

This results in a total offense level of 19.  Because Mitsakos's Criminal History Category is I, the applicable Guidelines range is 30 to 37 months of imprisonment.

The Guidelines calculation here, however, illustrates "the utter travesty of justice that [would] sometimes result[] from the Guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson* 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006).

### OBJECTIONS TO THE PRESENTENCE REPORT'S ANALYSIS

Mitsakos submitted his objections to the Presentence Report, but takes issue with certain points made in the Probation Department's "Justification" for its sentencing recommendation:

> • "As is often the case in securities and wire fraud offenses similar to the defendant's offense, he may be able to argue that his initial intention was to genuinely seek investments for his hedge fund.  However, the desire to acquire investments over a short period of time, with the confident belief that a positive return could be had from the investment, provides a false rationalization for breaking the law."  (PSR at 25-26).

As an initial matter, Mitsakos does not attempt to provide any rationalization for his misrepresentations in connection with raising funds for Matrix.  There are, however, some nuances that are critical to identify for the Court in considering Mitsakos's culpability.  *First,* Mitsakos did not intend to raise funds through misrepresentations, but rather to interest investors in the fund, with the expectation that the investors would be exposed to full disclosures concerning the fund.  Nevertheless, as he allocuted before the Court, he knew that what he did was wrong and that his disclosures were inadequate and misleading.

*Second*, Mitsakos did not intend to take investor funds and use them in any way other than investing them according to the strategies he outlined in the promotional literature. Mitsakos did not have a "desire to acquire investments over a short period of time, with the confident belief that a positive return could be had from the investment."  This was not a Ponzi scheme, and Mitsakos intended to manage the funds precisely as he had represented he would.

18

This is demonstrated by the transparency Mitsakos provided Meridian in his trading in the Prophecy account.  Mitsakos's trading activity revealed both his trading gains and losses.

*Third*, Mitsakos did not believe he was misappropriating Meridian's payment of $2 million.  He believed that the funds were for seed capital and operating expenses and was transparent about the disposition of those funds.  Indeed, he provided a detailed, line-by-line accounting as to how those funds were spent.  Upon learning Meridian's view that it had intended all of the funds to be invested, Mitsakos attempted to repay Meridian.

> • "Our position is further supported by concerns regarding Mitsakos's disclosure of his financial information and his financial status.  The defendant listed signatory control of only one bank [account] . . . for which he reported a zero balance.  It is unclear how he is covering a reported $6,380 per month in expenses, which does not account for the cost of rent, with no liquid assets."

Respectfully, it appears that the Probation Department overlooked certain disclosures in Mitsakos's net worth statement, his monthly cash flow statement, and the addendum he provided to those statements:

(i) In Section P of his Net Worth Statement, "Prospect of Increase in Assets," Mitsakos states explicitly that "I am in the process of selling 1 million shares of Cardax stock to pay [legal] fees and personal living expenses," which, in fact, he subsequently did;

(ii) in the Addendum to his Net Worth Statement, Mitsakos discloses that he "currently resides with his mother and she covers his personal living expenses.  Mr. Mitsakos is in the process of selling certain over-the-counter stock holdings to pay outstanding legal fees and to contribute to his personal living expenses"';

(iii) In his Monthly Cash Flow Statement, Mitsakos discloses that "I am in the process of selling 1 million shares of Cardax stock to pay legal fees and personal living expenses," which, in fact, he subsequently did.

• "As for the care of his mother and visiting his disabled sister in Los Angeles, the defendant was not his mother's primary caretaker prior to his instant arrest in August 2016, as he resided mainly in San Francisco.  Mitsakos's sister lives in a residential adult-care facility.  Furthermore, the defendant's brother, Peter, resides in Los Angeles."

As the many letters to the Court reveal, Mitsakos has been his mother's primary caretaker for many years, and especially after his father passed away in 2011.  Mitsakos has often traveled between San Francisco and Los Angeles to visit and stay with his mother.  And since his arrest, he has primarily lived with his mother in Los Angeles.  According to Nick's mother, Vincenza Mitsakos, "Each of us [Mitsakos's mother and his sister] has special needs, and Nick is the one person who addresses them.  I have one other son who, because of his personal, family and professional responsibilities is simply not available to play this role.  Nick is the only one."  (Ex. A at 1).  Furthermore, Vincenza states that Nick "has designed his professional and personal schedule to enable flexibility so that he can be responsive whenever I need him.  He spends most of his time with me."  (Ex. A at 2).  Nick's brother, Peter, writes that "[a]s a family, we discuss what is going on with [Victoria, Nick's sister] and how best to manage her care.  Nick is an important part of that dynamic and a source of reassurance and solace for our mother (and me, frankly).  His frequent presence in Los Angeles (he stays with our mother when he is here) has been of great benefit to her, both practically and emotionally."  (Ex. B at 2).

• "A special condition requiring the defendant to submit his . . . computer . . ., electronic communications, data storage devices and/or other media under his control to a search is warranted since he used email, including sending attached documents to facilitate the offense."

Although we defer to the Court to set the appropriate conditions of probation or supervised release in this case, the PSR's recommendation of this special condition seems unwarranted and heavy-handed—a condition more appropriate to a defendant who has engaged in downloading child pornography than a first-time offender who has never been charged with

20

using the internet or electronic communications wrongfully other than in connection with this offense. Given that Mr. Mitsakos presents no chance of reoffending and that he is barred from the securities industry, such a special condition appears wholly unwarranted.

## **PERSONAL CHARACTERISTICS**

### I. **Nicholas Mitsakos's Childhood**

Nicholas Mitsakos, who is now 58 years old, was born on June 13, 1959, in Glen Cove, New York. He is the youngest of three children. Nick has one brother, Peter Mitsakos, and a sister, Victoria Mitsakos. Nick was raised by his parents in a middle-class neighborhood in Northport, New York. Nick's father was Greek and his Mother Italian-American. Nick's father Michael, a World War II veteran, passed away from a heart attack in 2011, and was employed as an aeronautical engineer. His mother, Vicenza, now 90 years old, worked as a Pan-Am Airlines dispatcher. Although Nick's family did not experience any financial difficulties during his childhood, times were particularly tough because of his sister Victoria's disability. Victoria, who is now 61 years old, has suffered from cerebral palsy and Dandy-Walker syndrome since birth. She has required constant care her entire life and now lives in an assisted-living facility. As Nick's brother Peter writes in his letter to the Court:

> We have an older sister, Victoria. She is mentally handicapped, with a developmental age of just about 16 months. She can't speak, she understands very little, she cannot dress or take care of herself. Everything must be done for her. Until she was 30 years old, she lived at home and my mother took care of her. We helped however we could. This situation affected our lives dramatically, in some good and some not so good ways. It of course restricted what we could do as a family and we had to learn to deal with difficult situations created by her behavior, which was hard for us as children. On the good side, both my brother and I developed a sense of responsibility and a seriousness about life at very early ages.

(Ex. B at 2).

## II. Nick's passion and acumen for business and entrepreneurship

The individuals who have written letters to the Court on Nick's behalf resoundingly describe Nick as a brilliant businessman who is passionate about what he does.  Michael Stockman, who has known Nick for over 25 years, describes him as a "brilliant, insightful, and honest businessman." (Exhibit C at 3).  According to Mr. Stockman, "[b]oth of our families taught us the value of hard work; it's in Nick's DNA.  And Nick works tirelessly.  Yet, despite his many achievements, Nick remains personally humble and has enormous intelligence, sensitivity and respect for cultural differences and needs." *Id.* at 2.

David Watumull, the CEO and co-founder of Hawaii Biotech and then Cardax Pharmaceuticals, "saw first-hand the substantial contributions Nick made." (Exhibit S at 1).  Watumull describes in his letter the important work that these companies have done, and continue to do, in the biopharmaceutical space that have the potential to help millions of people, including anti-inflammatory supplements and a possible vaccine for Dengue Fever.  *Id.*  Watumull credits Nick's work as chairman of Hawaii Biotech and then executive chair of Cardax for much of its success:  "I can state unequivocally that neither Cardax nor Hawaii Biotech would have survived without Nick's initial transformative investment." *Id.*

Miles Glidden, a friend of Nick's for over 33 years, credits Nick's "work as an investor, executive, board member, and advisor for over 40 companies, notably including Hawaii Biotech and Cardax Pharmaceuticals, [for] help[ing] create thousands of new well-paid jobs, while advancing the fight against disease." (Exhibit L at 1).  According to Mr. Glidden, "[p]rofessionally, I can't imagine someone less likely to be a burden to society or taxpayers, or more likely to use his unique skills to create business success that will benefit so many others." *Id.*

Nick's friend Robert Raney similarly describes Nick as "an amazing human being. . . . His intelligence and inexhaustible curiosity about the world around him have driven his success and created over one thousand jobs, many high paying.  Nick is on the board of directors or in a key advisor role for forty-three companies.  A focus is companies addressing unmet medical needs."  (Ex. K at 1-2).

Another longtime friend and business associate, Bob Beyer, writes that Nick's success "led me to invest side-by-side with him. . . . [W]hile the general environment became challenged for venture capital, Nick's intellectual acuity and extraordinary sourcing and analytical abilities kept us focused, and we were able to assemble a portfolio of interesting and diversifying investments, achieving our goal to do so." (Exhibit G at 1-2).

Teresa Wong, who has known Nick for the last 25 years, describes the challenges that are faced by startup companies and what Nick brings to the table.  "These environments, with groundbreaking scientific development, entrepreneurial zeal, and commercial reality, are extremely challenging, unpredictable and volatile.  Leading such a company, keeping focus and effectiveness, is an enormous challenge, and demands a unique combination of management, interpersonal, and behavioral skills."  (Ex. F at 1).  According to Ms. Wong, "I cannot emphasize enough how unique [Nick] is regarding his compassion, empathy, and work ethic.  I can honestly say that many great accomplishments from these companies simply would not have been possible if not for [Nick] and his personal qualities."  *Id.*

Shiri Kadambi, who met Nick nearly 20 years ago when Nick invested in his company, Maverick Networks, credits Nick for his "great advice."  (Exhibit I at 1).  Mr. Kadambi recounts Nick's verbal commitment to fund Maverick and the fact that Nick went through with his commitment despite the market not being bullish at the time.  He credits Maverick Network's

23

many successes to Nick's following through with his commitment to invest in the company. *Id.*
According to Kadambi, other companies have benefitted from Nick's vision and his business
ethics:

> Nick's impact on Silicon Valley (& US) has been very positive.  Either directly or
> indirectly it has resulted in thousands of jobs, hundreds of patents.  In spite of all his
> accomplishments, he is very humble and a very decent human being. . . .  In my lifetime, I
> have seen some finance folks on the greed side, Nick was and has always been just the
> opposite."

Ann Chung has known Nick for over 30 years.  Nick also served on the board of her non-
profit organization, the Hawaii Technology Trade Association, which is tasked with growing
Hawaii's technology industry.  Ann credits Nick for keeping the association moving forward.
(Ex. P).  Ann says that "Nick is highly respected in Honolulu's local business community.  He
has served on a number of boards and has been a consistent advocate for building innovation
industries in Hawaii." *Id.*

Nick is not only a talented businessman but he "takes particular care to always ensure
that everyone's views and opinions on the team are valued.  He's the type of person that is a true
leader and team player.  He makes people better around him.  He's a coach and mentor." (Ex. C
at 4).  According to Charles Garvin, "Nick has had, and continues to have, a genuine and
measurable impact on society. For years, Nick has volunteered to teach entrepreneurship classes
at UCLA and has helped mentor a rising generation of company founders." (Ex. E at 1).

Miles Glidden perfectly sums up the message so many friends and colleagues tried to
convey to the Court, "Over the years I've known him, Nick has been an important contributor to
the progress of others, from fellow grads in other fields, to the little leaguers he coached, to the
student he taught at UCLA in his spare time.  Having met several of his professional colleagues,

I know of the esteem in which he has been held, and the respect they have had for his thoughtful,

candid, and teaching-oriented engagement." (Ex. L at 1).

The consensus of his supporters is that Nick's approach to business is not "ruthless . . . by

any stretch of the imagination.  Quite to the contrary, he is one of the kindest, most gracious and

generous people I have ever met and he always looks out for the needs and wellbeing of others.

He has on many occasions expressed to me how important it is to him that with his businesses,

he is able to provide employment and prosperity for others."  (Ex. C at 3).  "Having worked

globally, basic kindness is deeply lacking in our modern world, but those who have spent even a

short period of time with Nick would inevitably include "kind" in their description of him,

myself included.  I do not use that word lightly."  (Ex. F at 3).

### III.  Nick's reputation for trustworthiness and the highest level of integrity

Teresa Wong states that in her experience with startup companies, "[t]he greatest demand

is for equanimity, integrity, and most of all, trustworthiness.  Nick has enabled these

groundbreaking companies to be successful because he embodies all of these characteristics in an

exemplary way."  (Ex. F at 1).

Daniel Medina, who has known Nick for over 30 years, provides the Court with a

specific anecdote that he believes exemplifies Nick's integrity and honesty:

> One of many examples in which I observed Nick's integrity first hand was approximately
> 26 years ago when I was working with a group that was exploring the purchase and
> recapitalization of a Southern California based failed Savings and Loan.  I turned to Nick
> for advice and guidance throughout, and among the many levels of his assistance was
> helping me to construct a set of projections for potential investors, as well as a summary
> memorandum.  At innumerable points along the way in constructing these projections and
> writing the summary memorandum, Nick continually advised caution, realism and restraint,
> counseling me "You have to be as honest to your investors with your assessment of the
> institution's potential as possible, you are going to be responsible to these people for their
> money."

25

> While I always believed myself to be honest, I came away with a deeper understanding of investor responsibility and was given a firsthand view of Nick's moral compass. . . . In the subsequent years, I have constantly called upon the lessons I learned from Nick during this process in guiding my professional behavior."

(Ex. M).

Richard Morris, an attorney at Herrick, Feinstein LLP who has known Mitsakos since 2013 was Herrick was engaged as counsel to Cardax Pharmaceuticals during its reverse public merger transaction, submitted a letter to the Court containing his impressions of Nick and interactions during that merger.  "Nick has steadfastly led Cardax to maintain the highest corporate governance standards.  During my representation of Cardax, Nick adopted policies and procedures to foster full compliance with the SEC regulations.  He supervised the adoption by Cardax of a Code of Ethics that is substantially equivalent to NYSE listed companies, consistently asked questions of Cardax's officers and professionals (including me, as counsel) and demonstrated high ethical standards as a corporate fiduciary."  (Ex. N at 1).

According to Morris, when Cardax suffered a setback during the development of a primary product, Nick led the board to obtain a full appreciation of the facts and provided full disclosure to the public despite the fact that doing so likely resulted in a decrease in the stock value and Nick's personal investment in the company.  And even shortly after he was charged in this case, Nick showed great concern "about taking proper steps in connection with Cardax, again demonstrating his primary focus as a corporate fiduciary."  *Id.*

While those who know Nick were utterly shocked to learn that he pleaded guilty to a crime, it also comes as no surprise that he took responsibility for his wrongdoing: "It is inconceivable for me to imagine that Nick conducted himself in an unethical manner. . . .  [But],

26

in conclusion, I believe that since Nicholas Mitsakos has taken responsibility for his actions, it validates his ethical character." (Ex. J at 1).

### IV. Nick's loyalty and friendship

Much has been discussed in this submission about Nick's community service and devotion to his family. It hardly comes as a surprise, therefore, that his friends have experienced from Nick the same degree of generosity. Charles Garvin, recalls that "[w]hen my first son was born, it was Nick among all our friends and family who was the first to reach the hospital with congratulations and our infant son's first toy. He always remembers my birthday and that of my wife; always offers sympathy when there's an illness or things go wrong. In my circle, nobody seems to pay attention to these things anymore, but Nick's old-world graciousness has never faltered." (Ex. E at 1).

Michael Stockman recounts that "[Nick] was there for me in 1997 when my dad died, and he helped me survive and recover from the worst experience of my life." (Ex. C at 2). And because Mr. Stockman "trusts Nick implicitly as an honest, trustworthy and enormously kind and caring individual," Nick serves as the godfather to Stockman's 7-year old daughter, Sophie.

Remarkably, Mr. Stockman is not the only person to have honored Nick with being the godfather to his children. Nick is also the godfather to the daughter of his good friend, Barbara Moore, who he met at Harvard and has known for over 33 years. Barbara describes in her letter how she has witnesses Nick "teaching my children everything from better drumming techniques to the finer points of biochemistry." (Ex. Q at 1).

Nick is also the godfather to Miles Glidden's daughter. (Ex. L at 1). There is a reason why so many of Nick's friends have chosen him to play such an important role in their children's lives: the genuine concern he has for others, that he shows not just through words, but deeds.

Indeed, Mr. Glidden was out of town when his father's condition began to deteriorate.  Nick dropped all of his responsibilities and devoted all of his time for many days to the Glidden family.  "He drove across town to get food for the family, and even cooked dinner for them himself one night.  He provided comfort and support in a time of need and was an angel for the Gliddens.  That is the Nick I know and I cannot believe he would intentionally harm anyone." (Ex. K at 2).

Although Nick does not have any children of his own, it is evident from the letters submitted on Nick's behalf that many of his friends' children think of Nick as their "uncle." According to Daniel Medina, "[p]erhaps the biggest indication of my faith and trust in Nick has been my willingness to allow him a role in the lives of my 3 children.  He has been a constant and welcome presence, and while they are not aware of his current situation, I expect him to continue to be a presence and share in their life events."  (Ex. M at 2).

Janice Kam, recalls that after she suffered significant complications with the birth of her daughter, Mikayla, "Nick was always there to check on me and to make sure my road to recovery was on track." (Ex. J at 1).  Likewise, George Davis writes that Nick has "taken an interest in each of my children (now in their 20's and 30's) and they all look forward to any chance to spend time with Nick.  They have seen how he is consistently and genuinely more interested in others than in himself and he has always been understated about his accomplishments over time."  (Ex. D).  George looks forward to having Nick "in my family's life indefinitely.  He is the type of person that operates with warmth, decency and genuine care for others."  (*Id.* at 3.)

Shiri Kadambi genuinely speaks for all of Nick's supporters when he says that "Nick is one of those rare individuals who is always there for his family and friends.  No matter how complex a task is, he is someone who is always there to give a helping hand."  (Ex. I at 2).

## A NON-GUIDELINE, NON-CUSTODIAL SENTENCE IS WARRANTED UNDER 18 U.S.C. §3553(a)

A district court may not presume that a Guidelines sentence is reasonable for any particular defendant, and, accordingly, must conduct its own independent review of the sentencing factors under 18 U.S.C. § 3553(a).  *See United States v. Cavera*, 550 F.3d 180, 189 (2d. Cir. 2007).  Under Section 3553(a), the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  *Id.* § 3553(a)(1).  The court must impose a sentence that is "sufficient, but not greater than necessary" to, in pertinent part: (i) "reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense." (*Id.* § 3553(a)(2)(A)); (ii) "afford adequate deterrence to criminal conduct" (Id. § 3553 (a)(2)(B)); "protect the public from further crimes of the defendant" (*Id.* 3553(a)(2)(C)); and (iv) promote rehabilitation. (*Id.* § 3553(a)(2)(D)).  The "sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Cavera*, 550 F.3d at 188.

In this case, for the reasons set forth in detail below, all of these factors favor a non-custodial sentence for Mr. Mitsakos.

**I.   A non-custodial sentence is warranted because of Mitsakos's personal and family circumstances.**

**A.  The impact of a prison sentence on Mitsakos's family will be devastating.**

Even under the mandatory Guidelines regime, departures for family circumstances were authorized for the benefit of the family, not the defendant, and were based on the sensible

rationale that a sentencing court should be "reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."  *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992).  *See also, United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (downward departure appropriate where "a close-knit family['s] . . . stability depend[ed] on [the defendant's] continued presence.").  Under the advisory Guidelines regime, the Court has the discretion to impose a sentence that spares the family unnecessary pain, and in the totality of the circumstances presented here, the Court should exercise that discretion here.  *See, e.g., United States v. Kilgannon*, 2008 WL 5423274, at *2 (E.D.N.Y. Dec. 29, 2008) (considering the needs of the family in fashioning a sentence under the standards set forth in 18 U.S.C. § 3553(a)).

Here, the case for a non-custodial sentence based on family circumstances is best made by Nick's mother and his brother.  According to his mother, Vincenza, Nick is primarily responsible for his sister Victoria's care and well-being:

> [Victoria] requires daily interaction with this facility via telephone, and weekly visits, at a minimum.  Nick coordinates all of this activity, communications and visits.  I am still able to visit weekly, and speak with [Victoria's] facility daily.  But, if not for Nick, this would not be possible.  My daughter also requires special medical care that Nick coordinates and oversees. . . .  Nick oversees and coordinates all of [Victoria's] medications and plans medical appointments and physical therapy.  This process is ongoing because her needs change as her condition deteriorates.  Her physical decline is inevitable.

(Ex. A at 2).  Nick also was responsible for saving Victoria's life when she fell a few years ago and suffered severe head trauma.  "This was a life-threatening situation, and since my daughter is nonverbal, if not for Nick, we could not communicate effectively with the doctors.  I believe his actions helped save my daughter's life.  She had brain surgery, an extended hospital stay, and significant neurological rehabilitation.  Nick enabled us to visit every day – driving me

and spending hours with the doctors as well as my daughter – and also helped coordinate her neurological rehabilitation." *Id.*

Vincenza also describes that her own needs increase daily because of her age and that Nick is her primary caretaker.   Several years ago, Vincenza fell and broke her kneecap.  Nick cared for Vincenza after the accident, took her to the hospital, arranged for a surgeon who would operate on Vincenza at her age (late 80's), cared for her during and after her surgery, and arranged physical therapy and follow-up visits. (Ex. A at 3).  Vincenza also describes that she underwent cataract surgery last year and that without Nick's presence she would not have been able to have the procedure.  Nick took her to all of her appointments, stayed with her throughout the procedure, and remained with her through her recovery until she was able to function normally.  Nick has spent 10 of the last 14 months at his mother's home in Los Angeles and he expects to live with her from now on because of her needs and requirements.   "Nick is invaluable to me.  I don't know what I will require next, but we know it will be lengthy and require significant medical attention.  Without Nick, this would not be possible for me." *Id.*

**B. Mitsakos's conduct represents aberrant behavior in an otherwise exemplary life.**

Under the advisory Guidelines regime, a sentencing judge is well within his discretion to impose a below Guidelines sentence where, as here, the "defendant's commission of the instant offenses was aberrant behavior," although perhaps "not aberrant as defined by the U.S. Sentencing Guidelines but rather as defined by Merriam Webster: . . . atypical." *United States v. Gupta*, 904 F. 2d 349 F. Supp. 2d 354 (S.D.N.Y. 2012).

Here, Mitsakos's wrongdoing was the result of his tireless efforts to tackle a business challenge and make it successful, despite the fact that he was in way over his head.  Mitsakos was not a hedge fund manager and not a securities trader.  He had devoted so much time and

31

resources, and expended so much of his own savings to try to make Matrix a success that he lost sight of prudent judgment.  It is clear that his offense conduct represents an anomalous detour in an otherwise exemplary life, dedicated to family, friendship, ethics, community service, and charitable works.

## II.  A non-custodial sentence is warranted to avoid unwarranted sentencing disparities.

An important objective of federal sentencing is to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. §3553(a)(6).  Despite our efforts, we could not find a single federal criminal case in which a defendant was charged and convicted of a crime in similar circumstances.  Rather, the cases we have found that are similar to the circumstances here have been resolved by civil regulatory proceedings, not criminal actions, and involved investment advisers with many more years of experience than Mitsakos had in the securities industry and far more egregious misrepresentations.  For example, *In the Matter of Acamar Global Investments and Rudolph A. Martin*, IAA Release No. 4050, March 18, 2015, the SEC brought an enforcement action against an SEC-registered investment adviser and its principal for making material misstatements about the adviser's amount of assets under management and its performance regarding its investment models.  *See* https://www.sec.gov/litigation/admin/2015/ia-4050.pdf.  The SEC found that Acamar falsely claimed in its Forms ADV that it managed assets in excess of $180 million in order to qualify for SEC registration, when, in fact, it managed less than $200,000, all on behalf of one client.  After trading with that single client's funds, the fund lost more than 90% of its value.

Similarly, the SEC brought an enforcement action against a hedge fund in *SEC v. Summit Asset Strategies Investment Management, LLC, et al.*, 15-CV-1429 (W.D. Wa.), alleging that the

defendants materially overstated its asset values in its 2013 year-end statements, allowing the investment adviser to withdraw significantly more money as net fund profits than it otherwise would have been entitled to under the offering documents.  *See* https://www.sec.gov/litigation/complaints/2015/comp-pr2015-178.pdf.

Likewise, in a recent enforcement action in this District, the SEC alleged that Justin Meadlin, an investment adviser, and Hyaline Capital Management, LLC, his advisory firm, made misrepresentations to clients and prospective investors, overstating the fund's assets under management by $12 million to $20 million, as well as misrepresenting the nature of one of its trading strategies.  *See* http://www.lexissecuritiesmosaic.com/gateway/sec/litigation-release/2017_comp23808.pdf.  According to the complaint, those misrepresentations resulted in the fund obtaining two new clients that resulted in investors suffering losses.

The SEC also brought an enforcement action against Virtus Investment Advisors based on "misstatements . . . concerning its subadviser F-Squared Investment, Inc's . . . materially inflated, and hypothetical and back-tested, performance track record."  *See* https://www.sec.gov/litigation/admin/2015/ia-4266.pdf.  And the SEC similarly brought an enforcement action against Aphelion Fund Management and its investment officer Vineet Kalucha for misstatements to investors and potential investors about the fund's performance and assets under management.  *See* https://www.sec.gov/news/press-release/2014-92#.U3aUbdJOXox.

None of the above cases resulted in criminal prosecutions or convictions.  Here, Mr. Mitsakos has settled the SEC's claim against him and has agreed to be permanently barred from the securities industry.  Furthermore, unlike the cases above, which involve more egregious behavior from more experienced securities professionals, Mr. Mitsakos has pleaded guilty to a

33

felony, and agreed to pay restitution and forfeiture under the plea agreement.  A prison sentence in these circumstances would be disproportionate.

## III.  A non-custodial sentence is sufficient to satisfy the goal of specific deterrence.

Mitsakos's otherwise unblemished record in the business world, his lengthy history of dedication to charitable and community causes, and his devotion to family and friends provides a strong track record that demonstrates that he will be a productive member of society and will not reoffend.  He is currently employed as an officer of a biotechnology company devoted to potentially revolutionary cancer therapies, and has committed himself to service of his community. He has a stable family environment and a strong support network.  At 58 years old, having taken a substantial blow to his reputation, and having caused his family great consternation, Mitsakos surely has learned his lesson.  Given his otherwise unblemished history and remarkable achievements, he is virtually certain to never reoffend.  And because he is barred from the securities industry, he will not be in a position to reoffend.

Furthermore, the angst caused by the criminal process has taken its toll on him and his family.  His felony conviction will remain with him for the rest of his life.  The stigma of a felony conviction, and the collateral consequences of that conviction, including the restrictions on liberty attendant with a probationary sentence, will ensure that he will not commit another crime in the future.  *Redemann*, 295 F. Supp. 2d 887, 897 (E.D. Wis. 2003); *United States v. Mizrahi*, 2008 WL 3009983, at *2 (E.D.N.Y. 1993) (where defendant loses his or her livelihood and is thus prevented from engaging in similar crimes, "the necessity for achieving the purposes of sentencing through sentencing itself has been reduced.").

34

## IV. A non-custodial sentence is sufficient to achieve general deterrence

For the same reasons a non-custodial sentence is sufficient in this case to achieve

specific deterrence, it is also sufficient to achieve general deterrence.  Similar wrongdoing has

resulted in regulatory enforcement actions and penalties.  Not felony conviction.  Here, a felony

conviction, coupled with a sentence of probation provides substantial disincentives to others who

might consider committing crimes for which Mitsakos was convicted.  As the Supreme Court

observed in *Gall v. United States*, 552 U.S. 38, 48 (2007):

> We recognize that custodial sentences are qualitatively more severe than probationary
> sentences of equivalent terms.  Offenders on probation are nonetheless subject to several
> standard conditions that substantially restrict their liberty . . . Probationers may not leave
> the judicial district, move, or change jobs without notifying, and in some cases, receiving
> permission from, their probation officer or the court.  They must report regularly to their
> probation officer, permit unannounced visits to their homes, refrain from associating with
> any person convicted of a felony, and refrain from excessive drinking.  Most probationers
> are also subject to individual "special conditions" imposed by the court.

And as Judge Gleeson similarly commented, "when a judge chooses between a prison

term and probation, she is not choosing between punishment and no punishment.  Probation is

less severe than a prison term, but both are punishment.  And as the Supreme Court has

recognized, probation is *significant* punishment."  *United States v. Leitch*, 2013 WL 753445, at

*12 (E.D.N.Y. Feb. 2, 2013) (emphasis in original).  *See also, United States v. Coughlin*, 2008

WL 313099, at *5 (W.D. Ark. Feb. 1, 2009) ("Home detention and probation can be severe

punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply

retributive.").

Given the totality of what Mr. Mitsakos has already endured, and the additional

imposition of a sentence of probation, any citizen in Mitsakos's circumstances "need only

consider what happened to [Mr. Mitsakos] in order to reconsider [committing a similar offense]; thus, general deterrence [is] served." *Redemann*, 295 F. Supp. 2d at 897.

Furthermore, society will be far better off with Mr. Mitsakos out of prison than inside of it. His mother and sister depend on him. A biotechnology company depends on him and, with Mr. Mitsakos's expertise, expects to be able to accomplish significant cures for a deadly disease. Moreover, Mr. Mitsakos can put his considerable skills to use through community service, be it through teaching or service on charitable and community service organizations.

Indeed, Mr. Mitsakos has committed himself to devote himself to assisting the organization, The People Concern, an organization providing social services to the homeless in Los Angeles. The Executive Director of the People Concern, John Maceri, writes that Mr. Mitsakos's "extensive experience and knowledge in the business world dovetails closely with our needs at this time in our development; he has a talent for innovative thinking and familiarity with complex systems that would serve us well." (Ex. T at 2). Among other things, Mr. Maceri expects to utilize Mr. Mitsakos's talents to launch his organization's new initiative called Flyaway Homes, a project that "aims to repurpose discarded shipping containers . . . into comfortable and affordable homes for homeless individuals in a sustainable manner." Mr. Maceri believes that Mr. Mitsakos will be able to help The People Concern to tackle the significant obstacles attendant with such a project, "logistically, organizationally, [and] financially." (*Id.*). Mr. Mitsakos has also expressed a willingness to perform "more direct service tasks for us," including "cooking and serving meals for the individuals in our facilities, assisting with classes we provide to help individuals transitioning from homelessness into housing, and other administrative tasks where we need support." (*Id.* at 3). "Nick has made a commitment to spend at least one full day a week of service to our organization." (*Id.*).

36

Here, a non-custodial sentence of probation with a requirement of community service is

warranted here, and is supported by experts in the area of criminal justice reform:

The case for use of community punishments in a rational society is a no-brainer. Compared with confinement in a jail or prison, they are less expensive to administer, less criminogenic[2], and more humane. They do less collateral damage to the lives and futures of offenders and their loved ones. They can be scaled to the seriousness of crimes for which they are imposed. When well managed, well targeted, and adequately funded, they result in lower reoffending rates. Those are among the reasons why most Western countries use community punishments much more, and imprisonment much less, than do American jurisdictions.

Tonry, Michael, *Community Punishments in a Rational Society* (February 18, 2017), Scholarship and

Criminal Justice Reform (Erik Luna, ed., 2017).

In 2005, the Office of Probation and Pretrial Services described community service as "a flexible,

personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-

effective, and fair — a 'win-win' proposition for everyone involved." *Court & Community: An Information Series*

*About U.S. Probation & Pretrial Services: Community Service*, Office of Probation and Pretrial Services,

Administrative Office of the U.S. Court (2005) ("Community service addresses the traditional sentencing goals

of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows

offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of

symbolic restitution when the community is the victim.").

To guide courts in selecting an appropriate candidate to perform community service, U.S. Probation and

Pretrial Services recommended:

---

[2] *See How Many Americans are Unnecessarily Incarcerated?*, Brennan Center for Justice, pg. 21 (2016) ("One body of research shows that prison may make some people more likely to commit crimes after release. Criminologists call this the "criminogenic" effect of prison.").

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence. *Id*

Some sentencing judges have long recognized that probation and community service can serve as a significant sanction on a defendant. In a major fraud case in the Eastern District of New York, Judge Gleeson eloquently spoke to the value of community service in sentencing:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million.

> In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?

> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.

> I am placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.

> Another is that you perform 500 hours of community service. It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.

Sentencing Transcript from *United States of America v. Shamilzadeh*, 04-CR-194 (JG) (E.D.N.Y.) (2008).

Mr. Mitsakos is an outstanding candidate for community service; he meets all the criteria the experts and authorities recommend to be considered by a court in its individualized assessment of a defendant.  He has absolutely no criminal history or history of violence, exhibits "personal and social stability," and he is highly willing and motivated to continue aiding his community.  *See Court & Community* (2005), supra.  Rigorous and appropriately structured community service will serve the needs of justice very effectively in his case, by taking his time and expertise and putting them to use in a constructive and useful manner—without unjustifiably punishing Nick, his family, or the taxpayers.

## CONCLUSION

As a result of his wrongdoing, Nicholas Mitsakos is "is humiliated, tearful, and willing to do whatever he needs to make amends." (Ex. H at 2).  For all the reasons set forth above, and in the accompanying exhibits, a non-custodial sentence for Mr. Mitsakos is sufficient, but not greater than necessary to achieve the purposes of federal sentencing under 18 U.S.C. §3553(a).

August 31, 2017
New York, New York

/s/ Eric M. Creizman
Eric M. Creizman
Melissa Madrigal
CREIZMAN PLLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
Tel.: (212) 972-0200
Fax: (646) 200-5022
Email: ecreiz@creizmanllc.com
Email: mmadrigal@creizmanllc.com