Case 1:16-cr-00631-DC   Document 52   Filed 09/07/17   Page 1 of 15



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*
The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

September 7, 2017

BY CM/ECF

Honorable Denny Chin
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

  Re: *United States* v. *Nicholas Mitsakos*, 16 Cr. 631 (DC)

Dear Judge Chin:

  The Government respectfully submits this letter in connection with the sentencing of the above-captioned defendant, Nicholas Mitsakos, which is scheduled to occur on September 14, 2017 at 2:00 p.m., and in response to the defendant's sentencing submission dated August 31, 2017 ("Def. Submission"). The parties have agreed that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range applicable to the defendant's conduct is 30 to 37 months' imprisonment, and Probation agrees with this calculation. For the reasons set forth below, the Government respectfully submits that a sentence within that range is appropriate.

## BACKGROUND

### I. The Offense Conduct

  The conduct at issue in this case is straightforward. Mitsakos created a hedge fund called Matrix Capital, LLC ("Matrix") in October 2013. (August 21, 2017 Presentence Report ("PSR") ¶ 9). He then lied to potential investors in the hopes of raising capital and, once he received his first investment, misappropriated hundreds of thousands of dollars to pay personal and business expenses. (*See* PSR ¶¶ 10-30). Mitsakos was subsequently charged by complaint with conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371; securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and wire fraud, in violation of Title 18, United States Code, Section 1343. (*See* Compl. 16 Mag. 4997 ("Compl.") (attached as Exhibit A)). A grand jury returned Indictment 16 Cr. 631 (DC), which charged him with the same offenses, on September 19, 2016.

Honorable Denny Chin
September 7, 2017
Page 2 of 15

### A. Mitsakos Solicits Investments in Matrix Capital Through a Series of Lies

Mitsakos told a series of lies to potential investors in order to get them to invest in Matrix (and therefore allow Mitsakos to earn lucrative management fees). These lies were conveyed to investors orally and in written marketing materials. They fall into four general categories: (1) claims that Matrix had significant assets under management, when, in reality, it had none; (2) false assertions that certain prominent investors had invested in Matrix and were serving as advisors to the fund; (3) false claims about Matrix's past returns; and (4) lies about the fund's auditors and other third party relationships. Each of these categories is explained in greater detail below.

<u>Assets Under Management</u>

To begin, Mitsakos lied to investors by telling them that he had millions of dollars under management when in reality he had none. The individual that ultimately invested with Mitsakos ("Victim-1") did so in part based on Mitsakos having represented that his fund had between $50 million and $100 million of assets under management, which provided Victim-1 assurance that Mitsakos's returns were real and that he could handle sizable investments.

Mitsakos, moreover, made the same false representations about his assets under management to others. He told representatives of a financial institution that his fund had over $100 million in assets. (PSR ¶ 12). And he told to other investors he solicited for money that he was already managing tens of millions of dollars. Indeed, Mitsakos told one individual ("Victim-2") that he managed "about 60 million give or take."[1] The following exchange occurred during a June 21, 2016 call recorded at the direction of law enforcement:

> VICTIM-2: So we're getting down to the short strokes here and I needed—I wanted to just, you know, kinda go through the all the data exchange and kind of, you know, sharpen my pencil a little bit and get—go through some of, you know, the more refined due-diligence questions that we normally go through. So if you don't mind, I'm just looking at your one-pager that you sent me—this is a March 31, 2016, one pager?
>
> MITSAKOS: Uh huh.
>
> VICTIM-2: And, you know, you had provided me with the daily returns, the spreadsheets for a period of time. I'd ask you for some other ones but you preferred to do the call. But I wanted to, if it was possible, try to get a little more detail on the trading and on things like assets under management and things like that. So uh … with regard to, I guess the easy—let's start with the easy stuff—I may have asked you this before, I don't have it in my notes, I apologize, but can

---

[1] Victim-2 did not invest with Mitsakos.

|  |  |
|---|---|
|  | you give me sort of a ballpark on your, on your AUM for, you know, sort of, the end of each year for you, for this track record 2012-13 through end of 15? |
| MITSAKOS: | Yeah absolutely, so so it started out in 2012, it was—with um, literally January 2012—with my money and a couple of other people's money, including Steve Connell, who is one of my advisors, and Bob Beyer and a couple of other people, we started out with about ten million dollars, and ah, and then the number dropped below that—there's been, there's been some distributions, there's been of personal money they just wanted some money out, but it's growing mostly organically. So it's really just that kind of organic growth, grew-grew about 10 million plus into 2014 and then in 2015 I started getting—we're talking institutions, right? And then I got some institutional money initially from the—that Swiss partner, initially putting in 20 million dollars and then another 20 million from then, which is coming in like right now. [UNINTELLIGBLE] |
| VICTIM-2: | Congratulations |
| MITSAKOS: | Thank you. And so, when you add it all up were at about 60 million, a little more than 60 million, about 60 million give or take, of assets under management. Again some of that . . . about half of that is gonna be from organic growth from the 10 million up with some, with some distribution. None of this came back to me, I kept all my money in. And then, then some of that went—that one additional partner that's putting in money as well. |
| VICTIM-2: | And so that would give you 60 million as of July 1? |
| MITSAKOS: | That's right, as of July 1. |

(*See* June 21, 2016 Transcript at 1-2 (attached as Exhibit B)). Mitsakos was obviously lying to induce Victim-2 to invest in this passage. Mitsakos did not start out with "about ten million dollars" of "[his own] and a couple of other people's money." There was never a "Swiss partner" that "put[] in 20 million dollars" and had "another 20 million . . . coming in like right now." And Matrix did not have "about 60 million give or take" at any time during its existence. To the contrary, Matrix had not invested any investor money at all until Victim-1 gave Mitsakos approximately $2 million.

In his sentencing submission, Mitsakos attempts to excuse this misrepresentation by claiming that the "bulk" of the newsletters and marketing materials he sent to potential investors "reflected that Assets Under Management were 'Capital Raising,' *i.e.*, there were no assets under management." (Def. Submission at 11). This argument is meritless. First, the fact that Mitsakos

Honorable Denny Chin
September 7, 2017
Page 4 of 15

may have told the truth in the "bulk" of occasions does not excuse his lies in the remainder. Mitsakos plainly did not tell Victim-1 or Victim-2 that "there were no assets under management"; he told both of them that the opposite was true, and he did it because he wanted their money.  Second, it is simply not the case that an investor would take "Capital Raising" to mean, as Mitsakos claims, that "there were no assets under management."  A fund that already has significant assets can obviously raise additional capital.

Other Investors

Related to his lies about assets under management, Mitsakos also falsely told potential investors that he had received capital from prominent investors.  Victim-1 told the Government in a proffer, for example, that Mitsakos told Victim-1 that individuals named Mark Mobius and Bob Beyer as well as others had invested with him.  Both Mobius and Beyer are well known in the investment field, Mobius for his role as a fund manager at Franklin Templeton Investments and Beyer for his role as Chief Executive Officer of a significant investment management firm.  In reality, however, neither Mobius nor Beyer had invested with Mitsakos or Matrix in any capacity.  And neither was an advisor to the fund.

Notably, Mitsakos told Victim-2 the same lie that he told Victim-1.  In the recorded call referenced above, the following exchange occurred after Victim-2 asked Mitsakos how many investors he had in Matrix:

> MITSAKOS: [T]here's me and about five other individuals who have their money with me.  Most of that money is mine, but the individuals— I mentioned this a little bit—each one of those individuals is also an advisor to the fund. They're an investor and an advisor.  So Pete, Pete Briger, Bob Beyer, Bill [UNINTELLIGIBLE], Mike Erickson from the Capital Group, you know they've got their money with me. And so does Mark Mobius.
>
> VICTIM-2: So then Mark Mobius, is not only an investor but an advisor to the fund?
>
> MITSAKOS: That's correct.
>
> VICTIM-2: That's impressive.
>
> MITSAKOS: [UNINTELLIGIBLE] I've worked with Mark in the mid 90s, working with transactions in Asia.  And I think we took a time in 95 and 96 and half my time in 97 in East Singapore with Mark. I'm still pretty close to him.  The guy who's the CEO—Franklin Templeton China—used to work for me on these deals, and so I'd get some pretty good data and a good platform information because of his Templeton system and because of my relationship with him. So that's the relationship with Mark. Bob Beyer? You

>           know, I worked with him at Drexel. That was 25 plus years ago.
>           Pete Briger is a Goldman buddy, from Fortress. So that's where
>           these come from. So—[UNINTELLIGBLE]
>
> VICTIM-2: Most of these are friends or family?
>
> MITSAKOS: Yeah, they're friends and family. If you want to do the investment
>           business, this is a good group of friends to have. Yeah, you're
>           right. It's friends and family. People that I've known well, they
>           know me. And that's where that money comes from.

(Ex. B at 6). Again, Mitsakos's claims in this exchange are complete fabrications meant to instill confidence in his victims. If potential investors believed that Mitsakos had already been entrusted with capital by prominent, sophisticated investors, they would be more likely to invest (and potentially without extensive due diligence since, presumably, individuals like Mobius and Beyer would have already kicked the tires). As already discussed, neither Mobius nor Beyer invested with Mitsakos or his fund. And the same is true with respect to the additional names referenced by Mitsakos—Pete Briger and Mike Erickson.

Past Returns

In addition to telling Victim-1 and a series of potential investors that he had millions of dollars under management, Mitsakos also lied about how well his "fund" was doing. While Mitsakos told potential investors that his trading had resulted in returns well in excess of the S&P 500, the truth of the matter was this his imaginary portfolio had been retroactively modified to eliminate bad trades and increase allocations to good ones. (*See* PSR ¶¶ 16-20).

On multiple occasions, Mitsakos simply instructed a co-conspirator at Matrix ("CC-1") to "trim[]" or eliminate bad trades. On May 13, 2014, for example, Mitsakos emailed CC-1 asking to "talk about our monthly performance in 2014," as that performance was low and would not be attractive to investors. (PSR ¶ 16). Mitsakos continued, "[W]e didn't really actively manage it, but there are some big monthly losses that I don't think we would've had if we were managing the portfolio. I know this is a bit of revisionist history, but I don't think it's too inaccurate to apply our standards retroactively." (*Id.*) Later that day, CC-1 responded, "I agree," and suggested "trim[ming]" two positions that had performed poorly in order to "see what that does to the performance [of the fund]." Later, on May 14, 2014, CC-1 emailed Mitsakos a series of "revised monthly returns" that were significantly higher and that were subsequently disseminated to potential investors. (*Id.*).

On June 30, 2014, moreover, CC-1 emailed Mitsakos and asked "[w]hat to do" with a particular investment that "could remain illiquid for the next 2-6 months." (PSR ¶ 17). Mitsakos responded, "I think we should assume that we would've sold [the investment] June 1"—that is, a month earlier. (*Id.*). The investment obviously had not been sold as of that date, whether as part of a real portfolio or a theoretical one. And between July 15, 2014 and July 17, 2017, Mitsakos and CC-1 retroactively added a significant position in a particular company while at the same

time reducing the fund's supposed cash balances in order to falsely improve its hypothetical performance. (*See* PSR ¶ 18 (noting that the changes resulted in an improvement in performance of the fund of approximately 5.7% in 2013 and 2.17% in 2014)).

Finally, in or about January 2015, Mitsakos simply increased his purported 2014 returns after a disastrous end to the year. This time there was not even a fake trade provided. (*Cf.* PSR ¶ 16). Instead, Mitsakos simply increased the purported 2014 annual return by nearly 20%. CC-1 told Mitsakos that (despite their earlier manipulation of the returns), their total 2014 return was only 0.4%. (PSR ¶ 19). Mitsakos then took sole control of distributing Matrix's performance information himself, and, in subsequently disseminated materials, increased Matrix's 2014 performance to 19.4% by changing the monthly returns. (*Id*.). This difference was plainly important to investors, including Victim-1; indeed, Mitsakos went from achieving no meaningful return to nearly doubling the return of the S&P500 in 2014.

## Trading and Auditors

Finally, Mitsakos lied to potential investors about his relationships with executing brokers and auditors. These lies were again meant to create a vaneer of legitimacy. Mitsakos, for example, falsely told investors and Victim-2 that Goldman Sachs and Jeffries had both served as executing brokers for his fund. (*See* Ex. B at 4-5 ("VICTIM-2: And have they … Since you started with the 10 million back in the day have you been consistently trading at Goldman? MITSAKOS: Goldman and Jeffries."). This was a lie. Mitsakos had no assets, so there was no trading and hence no executing brokers. When Victim-2 asked Mitsakos how he was able to secure a relationship with Goldman, moreover, Mitsakos stated that he "worked at Goldman when [he] started [his] career," and that they "[c]learly [] did this for an alum." While Mitsakos did at one point work at Goldman, it was as a summer intern.

Mitsakos also falsely claimed that his fund was audited by KPMG. In reality, Mitsakos had reached out to KPMG to discuss retaining them, but KPMG had never performed any work for Mitsakos. Nonetheless, Mitsakos listed KPMG as Matrix's auditor on newsletters sent to numerous potential investors, including Victim-1 and Victim-2. (*See, e.g.*, May 10, 2015 Newsletter (attached as Exhibit C)). This was plainly misleading. Indeed, based on information provided in a proffer with a representative of KPMG, a representative of KPMG received one of Mitsakos's newsletters in or about December 2015 and subsequently asked Mitsakos why KPMG was listed on the newsletter since it had not audited the information contained in it. Mitsakos said that he had made a mistake listing KPMG as his auditor and that he would remove it from his marketing materials going forward.

Mitsakos, however, did not remove KPMG from his marketing materials. To the contrary, Mitsakos told Victim-2 that his fund had actually been audited by KPMG, and, when asked about a disclaimer in one of Matrix's newsletters calling its results "unaudited," Mitsakos simply said that disclaimer was inaccurate:

> VICTIM-2: Let me ask you a question. I'm looking at these returns and as I want to do, I've read every syllable of your, of your one pager.

|  |  |
|---|---|
|  | And it says that you're an investment fund, and I'm assuming these are the returns for the fund.  But in your footnote, it says that this is, these are unaudited estimates.  And I'm unclear how I'm supposed to drive that? |
| MITSAKOS: | Ah, That footnote is ah, doesn't belong there.  It's a legacy from—I don't know how that got in there, honestly.  Um . . . |
| VICTIM-2: | So you're saying that these are audited numbers? |
| MITSAKOS: | Yeah, yeah, KPMG is my auditor, and they review everything. |
| VICTIM-2: | So these are not gross, and they're not gross of fees and expenses, and they're not unaudited. |
| MITSAKOS: | That is correct. |
| VICTIM-2: | Ok. |
| MITSAKOS: | Right |
| VICTIM-2: | Well that's a comfort.  I would change that if I were you. |
| MITSAKOS: | Yeah I'm gonna tell you, I'm alarmed to hear that. Like oh my god that's from— |

(*See* Ex. B at 6-7).

At bottom, Mitsakos was telling investors that he had a fund with tens of millions of dollars under management, including both his own money and money provided by prominent investors.  He told investors that he achieved astronomically high returns during the previous years.  A July 22, 2015 email sent to Victim-1, for example, listed Mitsakos's total returns since January 2012 as 199.3%.  (*See* July 22, 2015 Email (attached as Exhibit D)).  According to marketing materials Mitsakos created, this made Matrix the fourth best performing hedge fund in the word based on three-year compounded returns as of the end of 2014.  (*See* Sept. 21, 2015 Email (attached as Exhibit E)).  Given these misrepresentations, it should come as no surprise that Victim-1 invested with Mitsakos.  Indeed, as his call with Victim-2 demonstrates, Mitsakos was still attempting to raise capital at the time he was arrested.  He likely would have duped additional investors had the Government not interceded.

### B.  Mitsakos Steals Hundreds of Thousands of Dollars from His Only Investor

Once Mitsakos convinced a potential investor to provide capital, Mitsakos stole a significant amount of that money.  In September 2015, Victim-1 wired approximately

$1,993,500 to Mitsakos. (PSR ¶ 24). This investment was made in reliance on Mitsakos's representations to Victim-1 about the past performance of his fund, its size, and its advisors and relationships, among other things. As a technical matter, the investment was meant to capitalize a new fund that would be managed by Mitsakos in the same manner that Mitsakos had managed Matrix. Victim-1 would then raise additional capital for the fund, and the parties would share the management fees for the account. (PSR ¶¶ 24-25).

Of the money Mitsakos received from Victim-1, Mitsakos invested approximately $1.2 million through a leveraged vehicle that allowed him, in essence, to trade on margin. He kept the remaining $793,500 in a bank account that he controlled. (PSR ¶¶ 25, 27). Mitsakos then used portions of that amount to pay expenses related to Matrix's operation as well as his own personal expenses. He wired $32,483 to Bloomberg, for example, and $133,650 to various other financial services companies. (PSR ¶ 28). He also used $104,326 for credit card expenses, $11,000 for car payments on luxury vehicles, and $72,000 for past-due rent payments to his landlord. (PSR ¶¶ 28, 29).

Mitsakos now claims that he was entitled to this money as an agreed-upon pre-payment of management fees. (*See* Def. Submission at 14-15). This claim is frivolous.

First, while Mitsakos claims in his sentencing submission that Victim-1 "told [him] that he recognized that Mitsakos had incurred close to $400,000 of out-of-pocket expenses in preparing to run the Meridian-Matrix fund and promised to provide capital to Matrix to cover those expenses," this claim should be given no weight. It is not supported by an affidavit from Mitsakos that would be subject to the penalty of perjury, and it is not true. As Victim-1 explained during a proffer with the Government, neither Victim-1 nor anyone else at Victim-1's firm ever understood the approximately $2 million invested with Mitsakos to have included a $400,000 payment. And this account makes sense: if there was such an agreement, it would have been in writing given its size and given the fact that nearly every other aspect of the relationship between Mitsakos and Victim-1 was governed by contract.

Second, subsequent events contradict Mitsakos's claim that he had been authorized to spend hundreds of thousands of dollars from Victim-1's investment on himself. Based on the Government's conversations with Victim-1, Victim-1 eventually learned about the misappropriation because he complained to the bank; Victim-1 was neither given access to account information off the bat nor was Victim-1 given access by virtue of any disclosure or transparency by Mitsakos (*but see* Def. Submission at 19). Once he received access, moreover, Victim-1 and individuals at Victim-1's firm accused Mitsakos of fraud (again, a reaction that is inconsistent with their having been a preexisting agreement). In response to those accusations, Mitsakos claimed that he was entitled to keep some of the money as prepaid management fees. But he never claimed that Victim-1 had agreed to this; instead, he described it, in substance, as self-help that was justified by virtue of Victim-1's failure to raise as much additional outside capital as hoped. (*Id.*). Of course, Victim-1's failure to have raised capital does not excuse Mitsakos's theft of its money.

Further, after being confronted, Mitsakos agreed to pay back the money—which, had he been entitled to it, he presumably would not have done. (PSR ¶ 26). And the way that Mitsakos agreed to pay it back included yet more lies. Mitsakos told Victim-1 that he would transfer his own shares in Matrix to Victim-1 as payment. (*Id.*). Victim-1 asked how much money Mitsakos even had in the fund to use as payment, Mitsakos said, again, based on the Government's conversations with Victim-1, "around $15 million." This claim was obviously false; Mitsakos did not have any money invested in his fund, and he had no shares in it for the straightforward reason that the fund was entirely fictional. Obviously, Victim-1 was never repaid, with the exception of several wire transfers containing its own money.

## II. The Defendant's Offense Level and Criminal History Category

Mitsakos pled guilty on May 25, 2017 pursuant to a plea agreement with the Government. In the plea agreement, Mitsakos and the Government agreed that the Guidelines range applicable to the defendant's conduct was 30 to 37 months' imprisonment (the "Stipulated Guidelines Range"). Probation agreed with this calculation as well. (PSR ¶ 113).

The defendant pled guilty to a violation of Title 18, United States Code, Section 371, which has a statutory maximum of five years' imprisonment. Because he was allowed to plead to this offense rather than a substantive wire fraud or securities fraud count, which would have had a higher statutory maximum, his base offense level under Section 2B1.1(a)(2) of the Guidelines was six. *See* U.S.S.G. § 2B1.1(a) (providing for a base offense level of seven if the offense has a statutory maximum term of imprisonment of 20 years or more, and six otherwise). This offense level is then increased by 14 points pursuant to Section 2B1.1(b)(1)(H) based on the parties' agreement that the offense involved losses of more than $550,000 but less than $1,500,000 to Victim-1. The offense level is also increased by two points pursuant to Section 3B1.1(c) because the defendant was an organizer, leader, manager, or supervisor of criminal activity at Matrix. This results in a offense level of 22, which is reduced by three under Section 3E1.1(b) for the defendant's acceptance of responsibility during his plea. Because the defendant does not have any criminal history of which the Government is aware, his Criminal History Category is I. His guidelines range is accordingly 30 to 37 months.

Mitsakos also agreed in the parties' plea agreement to forfeit and pay restitution in an amount of $861,163.62, which represents losses incurred by Victim-1.

## **DISCUSSION**

As the Court knows, a sentencing judge must begin the process of imposing sentence by calculating the applicable Guidelines range. *See United States* v. *Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."); *United States* v. *Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable."). After calculating the applicable Guidelines range, a court may impose a sentence above or below the Guidelines range in order to

meet the sentencing goals set forth in Section 3553(a) if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considering by the Sentencing Commission." U.S.S.G. § 3553(b)(1).  The sentencing goals identified in Section 3553(a) include, among other things, promoting respect for the law, providing just punishment, and deterring criminal conduct.  *See United States* v. *Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)).[2]

Here, a sentence within the Stipulated Guidelines range of 30 to 37 months' imprisonment would be sufficient but not greater than necessary to accomplish the goals of sentencing.  As discussed in greater detail below, the defendant's conduct, and in particular his refusal to accept full responsibility in his own sentencing submission for his actions, demonstrates the need for a significant sentence of incarceration.

### A. The Defendant's Conduct Warrants a Significant Term of Imprisonment

The nature of Mitsakos's conduct requires a significant sentence of imprisonment in order to reflect the seriousness of his crime, provide just punishment, and deter criminal conduct. Mitsakos stole hundreds of thousands of dollars from Victim-1 and lost hundreds of thousands more by trading the portion of Victim-1's investment that he actually invested—an investment that Victim-1 would never had made had it known that Mitsakos's fund had no assets and had fake returns.  The money that Mitsakos stole and lost, moreover, consisted of the vast majority of the savings of a family located in Alabama that had in turn invested with Victim-1 (the "Alabama Victims").  That family's savings paid for Mitsakos's luxury cars, lifestyle, and $9,000 a month rent.  (*See* PSR ¶¶ 107 (vehicles), 109 (rent and additional vehicles)).

Further, Mitsakos did more than just defraud Victim-1 (and, through Victim-1, the Alabama Victims).  Mitsakos tried to raise many millions of dollars beyond what Victim-1 provided through misrepresentations and omissions in marketing materials and pitches to potential investors.  Had Mitsakos not been arrested in connection with this case, others investors very likely would have been deceived into giving even more money to Mitsakos.

This conduct requires significant deterrence.  Fraud schemes are difficult to detect and prosecute, especially where, as here, the defendants take means to obscure and hide their conduct—creating, for example, fake Bloomberg portfolios to make it seem as if they had been

---

[2]  The full set of factors outlined in Section 3553(a) are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, namely the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

trading successfully.  *Cf. United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").  Conduct like Mitsakos's also operates as an unwarranted tax on economic activity, eroding trust in markets and forcing investors to rely on self-help to protect themselves instead of assuming, as they should be entitled, that investment advisors will act legally and in good faith.

Mitsakos's conduct, moreover, cannot be explained away as a one-time mistake or an accident somehow fueled by emotion or desperation.  To the contrary, Mitsaksos's conduct was sophisticated, considered, and occurred of a lengthy period of time.  Mitsakos created a company and established relationships with banks and financial services providers.  He and his co-conspirators created detailed trading records that they manipulated to reach desired results.  And when directly confronted with questions about how much money Mitsakos had under management and whether his performance was audited, Mitsakos blatantly lied.  (*See, e.g.*, Ex. B).  This counsels in favor of a significant sentence of imprisonment.

### B.  Mitsakos's Attempts to Minimize his Misconduct Are Meritless

A strong deterrent message is also important in this case for the straightforward reason that Mitsakos does not seem to appreciate or understand the severity of his conduct and the effects that it had on his victims.  To the contrary, Mitsakos devotes much of his submission to an effort to rationalize his conduct.  He claims that he was expressly authorized by Victim-1 to spend nearly a third of its investment for personal and business expenses, despite the absence of any basis for this claim.  And he attempts to minimize the lies that he told to potential investors and Victim-1.  Mitsakos claims, for example, that (1) he assumed his investors would find out that he had "revised" his performance when conducting diligence; (2) that he assumed disclosures attached to his newsletters would prevent potential investors from being misled or confused; and (3) that he intended his performance revisions only to better reflect how Matrix would have invested funds and not "to artificially enhance its returns." (Def. Submission at 11).  Each of these arguments is meritless.

To begin, Mitsakos claims that he thought investors would figure out that the portfolio was "hypothetical" and that "revisions had been made to it over time" when conducting due diligence before making an investment.  (Def. Submission at 11).  This claim is frivolous and a classic attempt to blame the victim: it should be on Mitsakos to tell investors the truth, and not his investors to catch him doing otherwise.  This is especially true given that Mitsakos was soliciting investments at a size where it would not be practicable to hire teams of auditors and lawyers, which could cost hundreds of thousands of dollars.

Further, Mitsakos intentionally frustrated potential investor's efforts to conduct diligence.  Investors rely on managers' representations when conducting due diligence.  Victim-2's call with Mitsakos, for example, was described to him as an effort to conduct additional diligence by interviewing Mitsakos about his fund.  (Ex. B at 1-2).  And during that call, Mitsakos lied to Victim-2, claiming that he had tens of millions under management and that his returns were

Honorable Denny Chin
September 7, 2017
Page 12 of 15

based on actual trading that had been audited by KPMG (neither of which was true). In another situation, Victim-1 asked for Mitsakos's trading data to provide to an additional investor that Victim-1 had solicited for their joint fund (that is, the fund in which Victim-1 invested approximately $2 million). In response, Mitsakos said the data was corrupted and could not be retrieved. As he explained in an email, "there was a security issue, and a data breach" at Bloomberg, and, as a result, he could not provide audit trail data for his historical trading at Matrix. (*See* April 4, 2016 Email (attached as Exhibit F)). Based on conversations with representatives of Bloomberg, there was no such corruption; Mitsakos likely just made up an excuse because the data would have exposed his returns as fabricated and would have shown that he had no assets under management. In any event, having lied to his investors and reassured them that his returns were audited and that prominent investors had invested with him, Mitsakos cannot seriously claim that he assumed his investors would catch his lies.

Second, Mitsakos claims that he had the "expectation that [] investors would be exposed to full disclosures concerning the fund." (Def. Submission at 18). But it is by no means obvious what "disclosures" Mitsakos is referencing. While certain of his newsletters did call his returns unaudited, Mitsakos directly told Victim-2 in a recorded call that this statement was a mistake and that his returns were in fact audited by KPMG. (*See* Ex. B at 6-7).

Finally, Mitsakos claims that he revised Matrix's performance solely "to attempt to accurately reflect how Matrix would invest institutional funds." (Def. Submission at 11). He also claims that he in fact "did orally disclose to several investors that . . . there had been revisions." (*Id.*) These claim are again self-serving and unsubstantiated. Mitsakos presents no competent evidence to explain who was told of "revisions," and does not name the investors in question. And as discussed above, Mitsakos's conduct is flatly inconsistent with the claim that he was simply attempting to better reflect "how Matrix would invest institutional funds." Mitsakos, after all, at one point simply increased Matrix's 2014 performance by nearly 20%, raising it from 0.4% to 19.4%, without any apparent changes to trades or allocations. And the idea that bad trades can justifiably be eliminated on the grounds that, if he had real assets under management, he would spend more time "managing the portfolio" (PSR ¶ 16) is simply delusional. Investment managers are not given mulligans in the real world, and a sophisticated businessman like Mitsakos obviously knew this.

At bottom, the need for sentences to provide just punishment and deter criminality by a defendant oftentimes revolve around a defendant's acceptance of responsibility and desire to turn a corner in his or her life. Although Mitsakos admitted guilt during his plea allocution, his sentencing submission shows a lack of full acceptance and remorse.

### C. Mitsakos's Request for a Sentence of Time Served Is Inappropriate

Mitsakos makes several arguments in favor of downward variance and, in particular, a sentence of time served. While this Court can certainly consider his background and personal characteristics, the factors that Mitsakos identifies in his submission plainly do not support the extreme and unusual variance that he requests. Granting a downward variance would send an

Honorable Denny Chin
September 7, 2017
Page 13 of 15

improper signal to others in Mitsakos's position: that there is only upside from taking the same actions as this defendant. This Court should deny Mitsakos's request.

### 1. Mitsakos's Personal Characteristics Do Not Support a Downward Variance

To begin, Mitsakos claims that he deserves a downward variance in light of his personal characteristics and, in particular, his family situation. It is of course true that a sentence of incarceration would create difficulties for Mitsakos's family. But that is unfortunately true in the vast majority of cases in which a defendant is sentenced. Many defendants have children and spouses who will experience financial and emotional stresses from incarceration; those are absent here. And while Mitsakos would be separated from his mother and sister, it is worth noting Probation's conclusion that these impacts are overstated: "As for the care of his mother and visiting his disabled sister in Los Angeles, the defendant was not his mother's primary caretaker prior to his instant arrest in August 2016, as he resided mainly in San Francisco. Mitsakos's sister lives in a residential adult-care facility. Furthermore, the defendant's brother, Peter, resides in Los Angeles." (PSR at 26).

### 2. The Sentence Mitsakos Requests Would Result in Unwarranted Disparities with Similarly Situated Defendants

Mitsakos next claims that imposing a sentence of incarceration would result in an unwarranted sentencing disparity. (Def. Submission at 32). In particular, Mitsakos cites several SEC enforcement actions involving lies by investment managers about their track records. Mitsakos then claims that, because the actions he cited were not accompanied by criminal prosecution, it would be unfair to subject him to incarceration. (*Id.* at 32-33). This argument is meritless. The Government cannot prosecute every instance of criminal conduct; that is why deterrence is so important. The fact that some cases were, for whatever reason, not prosecuted criminally does not mean that the conduct is undeserving of punishment.

In any event, there are differences in the cases that Mitsakos cites and this one. The standard of proof in an SEC action is of course far different than the standard in a criminal case; some cases are prosecuted only civilly and not criminally because the proof does not rise to the sufficient level. And the cases that Mitsakos references do not involve the misappropriation of investor funds, as occurred here.

Further, there are plenty of counterexamples where defendants who engage in conduct similar to Mitsakos's did in fact receive significant terms of imprisonment. While the "recent enforcement action in this District . . . [against] Hyaline Capital Management, LLC . . . [for] overstating the fund's assets under management" was not accompanied by a parallel criminal action, for example, the defendant in *United States* v. *Stefan Lumiere*, No. 16 Cr. 483 (JSR), was found guilty of mismarking assets he managed at a hedge fund and sentenced to a term of imprisonment of 18 months. Lumiere was sentenced to imprisonment, moreover, even though he (unlike Mitsakos) did not steal money. There are also numerous cases in which a defendant

Honorable Denny Chin
September 7, 2017
Page 14 of 15

steals money through some wire or securities fraud and is sentenced to terms of imprisonment far lengthier than what the Guidelines and Probation recommend here.

### 3. The "Stigma" of Mitsakos's Conviction Is Insufficient to Satisfy the Goals of General and Specific Deterrence

Finally, Mitsakos claims that a non-custodial sentence can satisfy the goals of specific and general deterrence. (Def. Submission at 34-38). Individuals who commit frauds, however, do so on the basis of some cost-benefit analysis—a belief, in other words, that their likelihood of financial gain outweighs the risk that they will actually be caught and successfully prosecuted. In this context, a deterrent signal is necessary to change behavior. If Mitsakos and people like him believe that they can explain their way to a sentence of time served, there will be little disincentive to lie to investors, or other counterparties in various transactions, and steal their money. That imposes a cost not just on the relevant victims, but on society generally.

While Mitsakos claims that the "stigma" of a conviction is itself a sufficient punishment, all of the evidence points to the contrary. Indeed, despite his having pled guilty to conspiring to commit securities fraud and wire fraud in this case, Mitsakos is apparently already engaged as an executive at a biotechnology company. (*See* Def. Submission at 36). This is not someone who has been ruined by this case; this is a defendant who appears to be in the same position he was immediately before he began engaging in the lies and theft at issue here.

There is also more a need for specific deterrence. Fraud is oftentimes a crime of self-rationalization, and that is true of the offense here: as Probation notes, Mitsakos likely believed that he would manage his fund successfully, make money, repay Victim-1, and everyone would be better off. (*See* PSR at 26 ("[T]he desire to acquire investments over a short period of time, with the confident belief that a positive return could be had from the investment, provides a false rationalization for breaking the law. We content that such is the case for the defendant . . . .")). Even now, Mitsakos appears to believe that his conduct was not particularly serious, repeatedly claiming that investors should have found out about his lies in due diligence and that his "revisions" of his fund's performance were simply genuine efforts to better match the outsized returns that, had he been truly focused, he would have achieved. These are not arguments made by someone who has accepted responsibility, who understands what he did was wrong, and who is committed to change. These are the arguments of someone who needs to experience of the consequences of his actions in order to internalize their seriousness.

Honorable Denny Chin
September 7, 2017
Page 15 of 15

## Conclusion

     For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines range stipulated by the parties would be appropriate.

                              Respectfully submitted,

                              JOON H. KIM
                              Acting United States Attorney

               By:     /s/
                              Robert Allen/Brendan Quigley
                              Assistant United States Attorney
                              (212) 637-2216/2190

cc: Eric Creizman, Esq. (counsel for defendant)